**LIBERTY MUTUAL INSURANCE COMPANY, et al.**             **PLAINTIFFS**

**vs.**                                    **CIVIL ACTION NO.  3:17-CV-599-CRS**

**THE ESTATE OF HUGO J. BOBZIEN, JR.**
    **By and through his personal Representative**
    **and Administratrix, THERESA B. HART, et al.**             **DEFENDANT**

## MEMORANDUM OPINION

This matter is before the court for consideration of cross-motions for summary judgment in this declaratory judgment action.  The plaintiffs, Liberty Mutual Insurance Company, Liberty Insurance Corporation, Liberty Mutual Fire Insurance Company, and LM Insurance Corporation (collectively herein "Liberty" or the "Liberty entities"), contend that there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00 excluding interest and costs, satisfying the requirement that independent subject matter jurisdiction exist for this court to "declare the rights and other legal relations" of the parties. 28 U.S.C. § 2201(a); *Brotherhood Mut. Ins. Co. v. United Apostolic Lighthouse, Inc.*, 200 F.Supp.2d 689, 691 (E.D.Ky. 2002).  The defendants, the Estate of Hugo J. Bobzien, Jr. ("Hugo's Estate," "Hugo," or the "father" herein, as appropriate) and Michael J. Bobzien ("Michael" or the "son" herein), do not challenge the assertion of subject matter jurisdiction.

The Liberty entities are each alleged to be organized under the laws of states other than Kentucky and to have principal places of business outside the Commonwealth. Complaint, DN 1, pp. 2, PageID #2.  They are all licensed to do business in Kentucky.  Hugo's Estate is capable of being sued by and through its Administratrix, Theresa B. Hart, who is a citizen of Kentucky.

Michael is a citizen of the state of Florida and the plaintiff in the underlying lawsuit brought in the Jefferson County, Kentucky, Circuit Court. The court thus finds that there is complete diversity between the parties. The allegation that the amount in controversy exceeds $75,000.00 is unchallenged and will therefore be accepted for purposes of finding that this court has subject matter jurisdiction over this matter. We note that the allegations in the underlying state court complaint claim Michael suffered numerous and significant bodily injuries which could yield a damage award in excess of $75,000.00.

Upon a finding of subject matter jurisdiction, the court must determine, in its discretion, whether the case is an appropriate one for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.* The principal considerations in making this determination are (1) whether the judgment would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for purposes of "procedural fencing" or "to provide an arena for a race for *res judicata*"; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective. *Am. Home Assurance Co. v. Evans*, 791 F.2d 61, 63 (6th Cir. 1986)(citing *Grand Trunk Western R.R. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)). The parties are in agreement that the court should exercise its discretion to render a declaratory judgment. For the reasons set forth below, the court will entertain the summary judgment arguments and render a declaratory judgment in this case.

## A. Undisputed Facts[1] - State Court Litigation

Michael was born in 1958 and is the biological son of Hugo.  Michael resided in his father's household under his father's care, control and dominion, from birth until he reached the age of majority in approximately 1976.  In the FAC, Michael recites the following events:

> From the date of his birth until he reached the age of majority, [Michael] was repeatedly, forcibly, knowingly, intentionally, wantonly, chronically, recklessly, grossly negligently and/or negligently exposed and subjected to [his father's] hazardous cigarette smoke while he necessarily lived at his childhood residence under the exclusive control and dominion of [his father], primarily in this county.

> As a direct, natural and foreseeable result of [Hugo's] decisions to repeatedly, forcibly, knowingly, intentionally, wantonly, chronically, recklessly, grossly negligently and/or negligently expose and subject [Michael] to his hazardous cigarette smoke, and as a substantial factor and proximate cause of such decisions, [Michael] has recently, and within one year from commencement of this action, been caused to develop chronic obstructive pulmonary disease, osteopenia (with 2 chronic compression fractures of his L2 and T2 vertebrae, osteoarthritis in hips and knees, chronic back pain and/or degenerative disc disease, cataracts, past and future medical costs, past and future pain and suffering, past and future loss of enjoyment of life, permanent impairment of the power to labor and earn money, loss of future life expectancy, past and future inconvenience and other serious injuries and harms.

> The conduct of [Hugo] as herein alleged was committed intentionally, knowingly, wantonly, recklessly and/or with gross negligence.

Hugo died on March 30, 2016.  After his father's death, Michael filed claims for bodily injury in the probate action, but his claims were disallowed.  He then filed a state court action [Civ. Action No. 17-CI-002751] containing the above factual allegations and presenting three claims for relief: negligence, negligence per se, and premises liability.  Each claim articulates a duty owed by the father to the son:  a common law duty owed by Hugo to exercise ordinary care for the

---

[1] These "facts" are primarily gleaned from the allegations in the First Amended Complaint ("FAC") in *Michael J. Bobzien v. Estate of Hugo J. Bobzien, Jr.*, Civ. Action No. 17-CI-002751 filed, with leave, on October 14, 2017, and are taken as true for purposes of our "eight corners" analysis; that is, our comparison of the allegations of fact within the four corners of the Amended Complaint with the terms of coverage found within the four corners of the insurance policies in issue. The FAC can be found at DN 23-2, PageID #289-295.

protection of his son (negligence); a statutory duty owed by Hugo to exercise ordinary care for the protection of his son (negligence per se); and a duty owed by Hugo to exercise ordinary care to make his property reasonably safe for invitees, including his then minor son (premises liability). The claims are identically written, with the exception of the particular duty to which the claim refers. Representative of the claims, **Count 1 – Negligence** alleges:

> At all times relevant, [Hugo] had a common law duty to exercise ordinary care for the protection of his son, [Michael], which included the duty to refrain from repeatedly, forcibly, knowingly, intentionally, wantonly, chronically, recklessly, grossly negligently and/or negligently exposing and subjecting his minor son, the Plaintiff, to unsafe, dangerous, neglectful, abusive and/or harmful conditions, including his hazardous cigarette smoke.
>
> At all times relevant, [Hugo] breached the foregoing common law duty by repeatedly, forcibly, knowingly, intentionally, wantonly, chronically, recklessly, grossly negligently and/or negligently exposing and subjecting his son to his hazardous cigarette smoke.
>
> As a direct, natural, foreseeable, factual and proximate cause of [Hugo's] breaches of the foregoing common law duty, [Michael] has been seriously injured and harmed as herein previously alleged.
>
> The conduct of [Hugo] as herein alleged was undertaken intentionally, knowingly, wantonly, recklessly and/or with gross negligence, thereby entitling [Michael] to an award of punitive damages.

DN 23-2. Michael's illnesses and conditions allegedly resulted from his childhood exposure to secondhand smoke. The FAC frames the claims to allege breaches of duty as a result of Hugo's *decisions* to expose his son to that hazardous condition. Hugo's Estate has answered and denied these claims. The state action is ongoing.

Hugo's Estate provided notice of the suit to the Liberty entities. They are defending the state court action under a reservation of rights while seeking a declaration from this court that they have no obligation to indemnify or further defend Hugo's Estate under any of the policies issued to Hugo.

## B. Exercise of Jurisdiction – Considerations

The parties assert that adjudicating the coverage issues "by comparing the allegations in the underlying complaint with the terms of the insurance policy"[2] will not require any fact-finding. The question as to the obligations, if any, of the insurer to the insured are generally matters of law, and thus may be decided by this court. *Cincinnati Ins. Co. v. Motorist Mutual Ins. Co.*, 306 S.W.3d 69, 73 (Ky. 2010).

A declaration of "no coverage" would clearly settle the dispute as between the Liberty entities and Hugo's Estate. So, too, would a finding in favor of Hugo's Estate[3] that the grounds articulated by the Liberty entities do not constitute an impediment to the Estate's demand for a defense and indemnification. In the event the court were to conclude that one or more of Michael's claims "potentially, possibly or might come within the coverage of the policy,"[4] the Liberty entities' duty to defend would be clear with respect to all of Michael's claims in the state court suit. *James Graham Brown Found.*, 814 S.W.2d at 279-80; *Martin County Coal Corp. v. Universal Underwriters Ins. Servs.*, 792 F.Supp.2d 598 F.3d 257 (6th Cir. 2010)(the duty to defend applies to all claims, once duty is triggered). Of course, this court cannot find that indemnity is owed to Hugo's Estate. If the policy terms are not preclusive, any obligation to indemnify would flow from the state court action. The parties recognize this and seek only a determination whether any of the policy terms preclude indemnity and relieve the Liberty entities of the duty to defend.

---

[2] *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 507 (6th Cir. 2003)(applying Kentucky law).
[3] Michael joins in the motion for summary judgment filed by Hugo's Estate. (DN 25). He offers some additional argument in his own brief styled "Reply of the Defendant, Michael J. Bobzien, in Support of the Motion for Summary Judgment of the Defendant, the Estate of Hugo J. Bobzien (Doc. No. 24)." Despite his acknowledgment that he is only derivatively invested in declaratory judgment on the coverage questions, Michael's brief has been considered and addressed herein to the extent it rounds out the factual bases for the action against his father.
[4] *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 279 (Ky. 1991)(citing *O'Bannon v. Aetna Cas. & Sur. Co.*, 678 S.W.2d 390, 392 (Ky. 1984)).

Therefore, this action serves a useful purpose in clarifying the legal relations between insurer and insured. A declaratory judgment in this regard would not encroach upon the state court's functions.

There is no question of "procedural fencing here" or a "race for *res judicata*." The Liberty entities simply wish to know whether they must remain engaged. The fleche[5] has occurred in the state court action. The matter before this court is no feint,[6] but rather a parry[7] from which the Liberty entities can discern their obligations to their insured.

There are no novel questions of state law raised in this declaratory action. There is sufficient Kentucky case law from which we can readily discern the principles upon which our analysis must be based, as well as the policy considerations undergirding those state court decisions. Further, the issues of coverage are not dependent upon any resolution of facts in the state court. Thus, we conclude that state court would be no better equipped than this court to decide the questions before us.

The court also concludes that there is no alternative to this declaratory action which is superior to the declaratory judgment process. The Liberty entities could file a declaratory action in the state court, either separately or by intervention in the state case, or wait and file an indemnity action after the liability question has been determined in the state court action. Neither option offers any advantage over the declaratory relief sought presently in this forum. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546 (6th Cir. 2008).

---

[5] An explosive running attack. *Glossary of Fencing Terms*, www.usafencing.org
[6] A false attack, intended to get a defensive reaction from the opposing fencer, thus creating the opportunity for a genuine attack. *Id.*
[7] A defensive action in which a fencer blocks his opponent's blade. *Id.*

Having found that the *Grand Trunk* factors militate in favor of the request by both parties that we endeavor to render a declaratory judgment herein, we proceed to consider the cross-motions for summary judgment.

### C. Undisputed Facts and Michael's Contentions – Declaratory Judgment Action

### 1. The Policies

There are five insurance policies[8] in issue in this litigation. Three are homeowners' policies, one is a condominium policy,[9] and one is a personal excess liability policy. The following policies were issued to Hugo in Kentucky as follows:

(1) Liberty Mutual Fire Insurance Company issued a homeowners' policy for the residence located at 2602 Cave Spring Place, Louisville, Kentucky, for successive periods beginning March 31, 2003 and ending March 31, 2011. (Policy No. H3228143799190).

(2) LM Insurance Corporation issued a condominium policy for the residence located at 727 Savoy Road, Louisville Kentucky, for continuing and successive periods beginning on March 31, 2011 and ending March 31, 2018. (Policy No. H6528149649140).

(3) Liberty Mutual Fire Insurance Company issued homeowners' policies for the residence located at 362 Sandy Beach Road, McDaniels, Kentucky, for successive periods beginning October 31, 2003 and ending October 31, 2006. (Policy Nos. H3228193162400 and H3228193162401).

---

[8] The policies are attached as exhibits A through E to the Complaint for Declaratory Judgment (DN 1).
[9] There is no apparent distinction for our purposes between a policy of coverage for a home or a condominium. We note the difference solely for factual accuracy.

(4) Liberty Insurance Corporation issued a homeowners' policy for the residence located 1045 Sandy Beach Lane, McDaniels, Kentucky, for successive periods beginning on September 15, 2010 and ending September 15, 2017. (Policy No. H3728145310740).

(5) Liberty Mutual Insurance Company issued a personal excess liability insurance policy for successive periods beginning September 13, 2003 and ending September 13, 2017. (Policy No. LJ128146130990).

(collectively the "Liberty policies" or the "policies" herein).

All of the homeowners' policies contain personal liability coverage provisions, various exclusions, and a set of definitions which are virtually identical. We quote the language in the Cave Spring Place policy, in pertinent part, as representative:

**Section II – Liability Coverages**

**Coverage E – Personal Liability**

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury"…caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which the "insured" is legally liable… and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent…

**Section II – Exclusions**

1. **Coverage E – Personal Liability**…do[es] not apply to "bodily injury":

…k. Arising out of sexual molestation, corporal punishment or physical or mental abuse…

**2. Coverage E – Personal Liability,** does not apply to:

…f. "Bodily injury" to you or an "insured" within the meaning of …"insured" as defined.

**Sections I and II – Conditions**

**1. Policy Period.** This policy applies only to…"bodily injury"…in Section II, which occurs during the policy period.

**Definitions**

…[C]ertain words and phrases are defined as follows:

1. "Bodily injury" means bodily harm, sickness or disease…

3. "Insured" means you and residents of your household who are…your relatives…

5. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in… "Bodily injury"…

The excess liability policy provides, in pertinent part:

**II. Coverage – Personal Excess Liability**

We will pay all sums in excess of the **retained limit** and up to our limit of liability for damages because of **personal injury**…to which this policy applies and for which the **insured** is legally liable.

**Exclusions**

This policy does not apply to **personal injury**…

a. Which is intended by the **insured.**

This policy also does not apply to:

h. **personal injury** to any **insured.**

## V. Conditions

### 1. Policy Period

This policy applies only to **personal injury**…which occurs during the policy period…

### 5. Loss Payable – Other Insurance

This policy applies only to damages in excess of the **retained limit** for an occurrence. If collectible insurance with any other insurer is available for a loss also covered by this policy, this policy will be excess and will not contribute with such other insurance.

An additional exclusion was added by addendum to the policy's **Section II. Coverage – Personal Excess Liability; Exclusions:**

This policy also does not apply to:

1. Personal injury…arising out of sexual molestation, corporal punishment or physical or mental abuse, including failure to detect, prevent, stop or report such molestation, punishment or abuse by others.

The **Definitions** state, in pertinent part:

## I. Definitions

**…3. "insured"** means you and…

    a. Residents of your household, but only if:

      (1) Related to you by blood…

    b. Any person…insured under any **underlying policy** for **bodily injury**…, but only when the limits of the **underlying policy** are exhausted…

  **5. "personal injury"** means all forms of personal injury. This also includes bodily injury and sickness or death at any time resulting therefrom…

  **9. "retained limit"** means as to each occurrence to which this policy applies the sum of:

    a. all amount payable under any **underlying policy**, if any, which would be payable under such policy but for the breach of policy conditions; and

    b. all amounts payable under any other insurance available to the **insured,** or which would be payable under such a policy in the absence of this policy…

  **11. "occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

    a. **"Personal injury"**…[10]

---

[10] Despite the use of the term "occurrence," the policy form in use from 9/13/2003 through the end of the first renewal period on 9/13/2005 did not contain a definition of that term. A definition of "occurrence" was first included in the policy beginning with the policy period 9/13/2005-9/13/2006 and remained through the last renewal period ending 9/13/2017. No party has suggested that the pre-9/13/2005 policy language would mandate a different analytical result for the period 9/13/2003-9/13/2005 from that which is sought with respect to the later version. We will therefore address *all* the policies, issued and renewed, as falling under one analytical rubric, as argued by the parties in their cross-motions.

### 2. Michael's Contentions

Michael's claims are premised upon his diagnosis in 2016 with illnesses and conditions which he contends are "secondhand smoke-related injuries." DN 33, p. 9, PageID # 379. He states that he "was never aware of any harm, injury or potential claim against his father's Estate until many years after he was no longer a resident of his father's household." *Id.* He attaches the affidavit of Vincent M. Ivers., M.D. to his supplemental brief on summary judgment which supports his assertion of these 2016 diagnoses and Dr. Ivers' opinion that they are secondhand smoke-related. Dr. Ivers avers, in pertinent part:

> In my professional medical opinion as his treating physician, and based on the relevant patient history, Mr. Bobzien's COPD and osteopenia have been most likely caused by his exposure to second-hand tobacco smoke while he was a minor growing up in a smoking household.
>
> In my professional medical opinion as his treating physician, and based on the relevant patient history, the heavy second-hand tobacco smoke generated by Mr. Bobzien's now-deceased father, Hugo Bobzien, Jr., to which Mr. Bobzien was exposed throughout his minor years in the Bobzien household was a substantial factor in causing Mr. Bobzien's COPD and osteopenia.

DN 33-1, p.2, PageID # 383.[11]

### D. Overview of Coverage Arguments on Cross-Motions for Summary Judgment

Liberty seeks a declaration that the policy precludes coverage for all of Michael's claims and, concomitantly, Liberty has no duty to defend Hugo's Estate in the state court action. Liberty asserts three grounds for the relief it seeks.

First, Liberty notes that Michael alleges in the FAC that he was repeatedly exposed to secondhand cigarette smoke while he was a resident of his father's household many years prior to

---

[11] The Ivers Affidavit and Michael's own statements in a legal brief regarding his state case fall outside the four corners of Michael's state court complaint. This material is quoted solely for purposes of providing context for our analysis of the coverage issues.

issuance of any of the policies in question. It contends that Michael claims he was harmed during his childhood by the repeated exposure to secondhand smoke, despite the fact that he received diagnoses of various illnesses which developed after he reached adulthood and was no longer living in the family home. Thus, Liberty contends that the "occurrence" Michael alleges resulted in his "bodily injury" occurred before the effective dates of the policies. Liberty contends that scientific evidence supports a finding that harm occurs immediately upon exposure to secondhand smoke. It contends, therefore, that "bodily injury," defined as "harm, sickness or disease," occurred outside the policy periods, regardless of later developments of illness.[12]

Hugo's Estate counters that Liberty conflates exposure with injury in order to conclude that the FAC alleges "bodily injury" which occurred outside the policy period. The Estate argues that the focus must be on Michael's "bodily injury" in 2016, not the exposure when he was a child. It notes that an "occurrence" under the policies is an "accident" which results in "bodily injury" during the policy period. It contends that an "accident" is an unintended and unexpected result, and that the development of Michael's illnesses and conditions was unexpected and unintended by Hugo, and thus Michael's later development of illnesses and conditions was an "accident." The Estate contends that, despite the repeated exposure to a harmful condition decades before any policy period, there is potential for coverage because he does not allege he suffered any "bodily injury" from the exposure until 2016 and thus his "bodily injury" occurred during the policy period, as required as a condition for potential coverage.

Liberty rejoins that "bodily injury" under the policies must result from an "occurrence." In this instance, the only event alleged in the FAC was Hugo's act of repeatedly exposing Michael to secondhand smoke when Michael was a minor living in his father's household. The Estate

---

[12] Citing *Ins. Co. of N. Am. V. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980).

contends that no event is alleged to have occurred after the exposure to secondhand smoke. Therefore, the exposure is the only possible "occurrence" alleged in the FAC causing Michael's "bodily injury." The fact that Hugo's Estate contends that Hugo never intended for his son to become ill does not alter the fact that Hugo's smoking was an intentional act, not a fortuitous event.

Further, Liberty notes that an "insured" under the policies includes a relative residing in the "insured"'s (Hugo's) household. It argues that Michael would have been excluded from coverage for *any* "bodily injury," had any one of the policies been in effect at the time of the repeated exposure to this harmful condition, and therefore a finding of possible coverage would essentially afford "claims made" coverage under these "occurrence-based" policies in contravention of the intent of the parties.[13]

The parties disagree on the appropriate authority for determining whether an "accident" has been alleged, under the definition of "occurrence." Liberty contends that the FAC does not allege "bodily injury" caused by an "occurrence," as required for coverage under the policies, because the complaint does not allege that Hugo's exposure of his son to secondhand smoke was a fortuitous event, as defined by Kentucky's most recent case addressing what constitutes an "accident."[14]

Hugo's Estate counters that, under Kentucky law, the term "occurrence" is to be construed broadly and liberally in favor of extending coverage to the insured.[15] It argues that the injury, not the negligent act, is the "accident."[16] It contends that it was never part of Hugo's plan, design or

---

[13] Citing *State Farm Fire & Cas. Co. v. Estes*, 133 F.Supp.3d 893 (W.D.Ky. 2015) and *Kentucky Farm Bureau Mut. Ins. Co. v. Thompson*, 1 S.W.3d 475 (Ky. 1999).

[14] Citing *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.w.3d 69 (Ky. 2010), *as corrected*, (July 19, 2011) and *Martin/Elias Properties, LLC v. Acuity*, 2018 WL 1960872 (Ky. April 26, 2018).

[15] Citing *James Graham Brown Found.*, 814 S.W.2d at 278.

[16] Citing *Monticello Ins. Co. v. Ky. River Community Care, Inc.*, 173 F.3d 855 (E.D.Ky. 1999)(table); *Asbury College v. Ohio Ins.*, No. 2004-CA-001044-MR, 2005 WL 1252331 (Ky.App. May 27, 2005); *Stillwell v. Brock Bros., Inc.*, 736 F.Supp. 201 (S.D.Ind. 1990).

intent to cause injury to any of his children by exposing them to secondhand smoke, and that he could not have so planned or intended because such harm was not yet known to medical science. It argues that if the resulting damages were unintended, they were accidental, even though the original acts were intentional.[17]

Finally, Liberty argues that the FAC alleges "bodily injury" arising from "physical abuse," a term with a common dictionary definition of "physical maltreatment," conduct which is excluded from coverage under the policies.[18]

The Estate urges that Michael does not allege cruelty in his father's smoking habits, and thus his father's smoking around his children does not meet the common and ordinary understanding of "abuse." Further, he contends that the term "physical abuse" connotes an illegal activity in common thought. It contends that even if it was reasonable to construe the term "physical abuse" as physical maltreatment also, two reasonable interpretations exist, and therefore the court must construe the term in a manner favorable to the insured.[19]

### E. Legal Framework for Decision

### 1. Summary Judgment Standard

Before granting a motion for summary judgment, the court must find that "there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

---

[17] Citing *Bituminous Cas. Corp.v. Kenway Constr., Inc.,* 240 S.W.3d 633, 638 (Ky. 2007).
[18] Citing *Stone v. Ky. Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809 (Ky.App. 2000) and *Thiele v. Ky. Growers Ins.Co.*, 522 S.W.3d 198 (Ky. 2017).
[19] Citing *Louisville Gas & Elec. Co. v. Am. Ins. Co.*, 412 F.2d 908, 911 (6th Cir. 1969).

The moving party bears the initial burden to demonstrate "the absence of a genuine issue of material fact on at least one element" of the non-moving party's claims or defenses. *Stiles ex rel D.S. v. Grainger County, Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must then show that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence ... of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When both parties move for summary judgment, this Court "must evaluate each motion on its merits and view all facts and inference in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

## 2. Choice of Law

The parties agree that Kentucky law applies herein.

As a federal court sitting in diversity, this court must apply the choice-of-law rules of Kentucky. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)(A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits); *Security Ins. Co. of Hartford v. Kevin Tucker & Assoc., Inc.*, 64 F.3d 1001,1005 (6th Cir. 1995)(same).

In the insurance context, Kentucky applies the law of the state with the most significant relationship to the transaction and the parties, giving weight to the state understood to be the

"principal location of the insured risk" during the policy period.  *See Lewis v. Am. Family Ins. Group*, 555 S.W.2d 579, 582 (Ky. 1977).

The policies were all apparently purchased through a Kentucky insurance agent and were delivered to Hugo in Kentucky.  The homeowners' policies insured Kentucky properties and the excess policy related to certain homeowners' policies.[20] The claims for Michael's bodily injuries upon which the coverage claims are premised have been asserted in a lawsuit in a Kentucky state court.

Kentucky appears to have the most significant relationship to the transactions and parties, and thus the strongest interest in the outcome of this declaratory judgment action. Kentucky law will therefore be applied.

### 3.  Kentucky Law

The interpretation of insurance contracts in Kentucky is a matter of law for the court, and in the absence of factual disputes, may be determined on summary judgment.  *McFerrin v. Allstate Prop. & Cas. Co.*, 29 F.Supp.3d 924, 929 (E.D.Ky. 2014)(citations omitted).  Insurers must provide a defense in a suit if any of the allegations potentially, possibly, or might be covered. *Aetna Cas. & Surety Co. v. Commonwealth of Kentucky,* 179 S.W.3d 830, 841 (Ky. 2005).  If the insurer establishes that the policy does not cover the claims, there is no duty to defend.  *Ky. Assoc. of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 635 (Ky. 2005).

Insurance policies "should be interpreted according to the parties' mutual understanding at the time they entered into the contract and [s]uch mutual intention is to be deduced, if possible from the language of the contract alone."  *Nationwide Mut. Ins. Co. v. Nolan*, 10 S.W.3d 129,

---

[20] The excess policy lists the Cave Spring Place policy and the 362 Sandy Beach Road policy are listed along with an automobile policy in the Underlying Policy Schedule.

131-32 (Ky. 1999)(citations omitted). Policies must be read as a whole "without disregarding or inserting words or clauses and seeming contradictions should be harmonized if reasonably possible." *Kemper Nat'l Ins.Cos. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky. 2002)(citations omitted). "[W]here not ambiguous, the ordinary meaning of the words chosen by the insurer is to be followed." *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.,* 814 S.W.2d 273, 279 (Ky. 1991)(citations omitted).

Terms of insurance contracts "have no technical meaning in law and are to be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured." *Id.* But "this rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with…the plain meaning and/or language in the contract." *McClendon*, 157 S.W.3d at 630 (quoting *St. Paul Fire & Marine Ins. Co. v. Walton-Milward, Inc.*, 870 S.W.2d 223, 226 (Ky. 1994)). When the terms of an insurance contract are unambiguous and not unreasonable, they will be enforced. *Id.*

We note that the policies under which coverage is sought herein are homeowners' policies, not comprehensive general liability ("CGL") policies. *Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633 (Ky. 2007), a case upon which Hugo's Estate heavily relies, quoted extensively from the *Brown Foundation* case:

> "The primary purpose of a comprehensive general liability policy is to provide broad, comprehensive insurance." *See Brown Found.,* 814 S.W.2d at 278. Further, "the very name of the policy suggests the expectation of maximum coverage." *Id.* To that end, this Court stated that "[a]ll risks not expressly excluded [under the CGL policy] are covered, including those not contemplated by either party." *Id.*

240 S.W.3d at 638. Hugo's Estate cites *Brown Found.* for the proposition that the term "occurrence" is to be broadly and liberally construed in favor of extending coverage.

In *Lemming v. Commercial Union Ins. Co.,* 260 F.3d 574, 583-584 (6th Cir. 2001), the court quoted the same language from *Brown Found.* in acknowledging the broad and liberal construction of policy terms affording insureds coverage under CGL policies in Kentucky. However, the court concluded that since Lemming had purchased a *homeowners' insurance policy,* she was "not therefore entitled to such broad protections."

Before we embark on our analysis, we resolve the parties' disagreement as to which Kentucky cases control in determining whether a claimant has alleged an "accident" under the definition of "occurrence" in the policies for purposes of evaluating potential personal liability coverage. The court will follow *Martin/Elias Properties, LLC v. Acuity*, 544 S.W.3d 639 (Ky. 2018) which refined the legal analysis to be used in Kentucky to determine "whether something constitutes an *accident* for issues of CGL coverage." *Martin/Elias*, 544 S.W.3d at 643. The court specifically noted that the doctrine of fortuity, encompassing the concepts of both intent and control, is the construct to be employed, stating:

> Three years after *Bituminous*,[21] we unanimously decided *Cincinnati.*[22] Once again we were asked to address the term *accident* in a CGL policy. *Cincinnati* involved the faulty workmanship of a newly constructed house. The homeowners purchased it from Elite Homes, but after only five years, the house had to be completely razed because it was so poorly built. The homeowners made a claim against Elite Homes' CGL policy, claiming that the resulting damage was an occurrence under the policy. In deciding *Cincinnati*, we established a test different from the one articulated in *Bituminous*. Rather than asking, as we did in *Bituminous*, if the damage was outside the "plan, design or intent of the insured," we instead focused on a concept widely accepted in insurance law, the doctrine of "fortuity" of the event. [*Cincinnati*, 306 S.W.3d at 74]. In doing so, we recognized that there are two aspects of fortuity: intent and control. We held that the faulty-workmanship claim brought by the homeowners was not covered by the builder's CGL policy because the builder was

---

[21] *Bituminous Cas. Corp., 240 S.W.3d 633* cited herein and relied upon by Hugo's Estate as controlling authority.

[22] *Cincinnati Ins. Co. v. Motorist Mut. Ins. Co.,* 306 S.W.3d 69 (Ky. 2010).

in control of the construction of the residence and that the builder fully intended to take the action that he took on the project such that finding liability under the CGL policy would be tantamount to converting the builder's CGL policy into a performance bond or unconditional guarantee…

…[I]n determining whether an event constitutes an *accident* so as to afford the insured CGL policy coverage, courts must analyze this issue according to the doctrine of fortuity: 1) whether the insured intended the event to occur; and 2) whether the event was a 'chance event' beyond the control of the insured. [*Cincinnati*, 306 S.W.3d at 76 (internal citations omitted)]. If the insured did not intend the event or result to occur, and if the event or result that occurred was a chance event beyond the control of the insured, then CGL coverage covering *accidents* will apply to the benefit of the insured.

*Martin/Elias*, 544 S.W.3d at 642-643.

In applying this analysis in the case and finding that the resulting damage did not occur as a result of an accident, the court stated that

Like Gosney [Martin/Elias' subcontractor], the homebuilders in *Cincinnati* had full control over their work and executed their work according to their own plan. We held the resulting damage to the home was not of an accidental nature creating a fortuitous event, but rather an unintended consequence of poor workmanship…

While the trial court was Solomonic in its partial summary judgment splitting liability for this unfortunate loss, it failed to focus on the proper elements from *Cincinnati*. Instead of focusing on the fact that Gosney fully intended to do what he did and had complete control over the work to excavate the basement and stabilize the foundation, it focused instead on the fact that Gosney never intended to bring the entire house down. Because the actions taken by Gosney, which led to the property damage, were entirely under his control, and he fully intended to execute the plan as he did, we cannot say that the resulting damage throughout the property was an accident.

*Id.* at 644-645.[23]

---

[23] While *Bituminous* and the authorities cited therein were not expressly overruled by *Cincinnati* or M*artin/Elias*, we focus on the explicit direction provided by *Martin/Elias* for our analysis, inasmuch as the court there addressed the same "accident" language in the definition of "occurrence:" an "accident," including repeated exposure to a harmful condition. The policies at issue, however, further define "occurrence" as an accident which results, during the policy period, in "bodily injury."

The distinction drawn in *Lemming* described hereinabove is worthy of note. We agree that since we are addressing homeowners' policies rather than CGL policies in this action, the purposes underlying a 'broad and liberal construction' do not apply. However, though we are not liberally construing these homeowners' policies, as a general proposition, the more specific rule still applies that ambiguities, to the extent they exist, are to be construed in favor of the insured when more than one construction of the policy language is reasonable. *See Nat'l Underwriters v. Lexington Flying Club, Inc.*, 603 S.W.2d 490, 494 (Ky.App. 1979); *See also, Auto Club Property-Casualty Ins. Co. v. B.T. ex rel. Thomas*, 596 Fed.Appx. 409, 412 (6th Cir. 2015)("When terms are ambiguous, Kentucky's reasonable-expectations doctrine applies: the court interprets the terms 'in favor of the insured's reasonable expectations and construe[s] [them] as the average person would construe them.' [citations omitted]."). However, "to provide for more coverage than was anticipated or bargained for by either party at the time of contracting is not reasonable." *Id.; See also, Mclendon,* 157 S.W.3d at 633, n. 19 ("Courts cannot make a different insurance contract for the parties by enlarging the risks contrary to the natural and obvious meaning of the existing contract. [citation omitted].").

In ascertaining whether there is potential coverage under the Liberty policies, the court must consider the issues within the "eight corners" of the documents, as the parameters are sometimes called.

> As the name of the rule suggest, only two documents are ordinarily relevant to the determination of the duty to defend: the policy and the pleadings of the underlying claimant…If the four corners of a [complaint] allege facts stating a cause of action which potentially falls within the four corners of the policy's scope of coverage, the insurer has a duty to defend. If all of the facts alleged in the underlying [complaint] fall outside the scope of coverage, then there is no duty to defend.

*Auto-Owners Ins. Co. v. Car Wash Sys.,* 184 F.Supp.3d 625, 628 (E.D.Tenn. 2016)(quoting the "eight corners" rule described in *Liberty Mut. Ins. Co. v. Graham*, 473 F.3d 596, 599 (5th Cir. 2006); *See also*, *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 507 (6th Cir. 2003)("…compar[e] the allegations in the underlying complaint with the terms of the insurance policy. [citation omitted]. An insurance company has a duty to defend its insured if the language of an underlying complaint against the insured brings the action within the scope of the insurance contract."). The court looks to any analogous Kentucky cases interpreting the policy language. In a matter of first impression in Kentucky, the court must predict how the Supreme Court of Kentucky would resolve the issue. *Westfield Ins. Co.*, 336 F.3d at 508.

Finally, we note that "there must be an actual ambiguity [for the court to afford a reasonable construction of the term in favor of the insured]. 'The mere fact that [a party] attempt[s] to muddy the water and create some question of interpretation does not necessarily create an ambiguity.' [citations omitted]…'Every accident is an occurrence. But not every occurrence is, strictly speaking, an accident.' In the context of an insurance policy, 'occurrence' is 'construed as synonymous with an accident or kindred act—an unforeseen occurrence resulting in bodily injury to a person other than the one indemnified which may give rise to a claim against the insured.' [citation omitted]. *Davis v. Ky. Farm Bureau Mut. Ins. Co.*, 495 S.W.3d 159, 162 (Ky.App. 2016).

### F. Analysis

#### 1. Does the FAC allege an "occurrence" within the policies' periods?

The policies' Personal Liability coverage provision states that Liberty will provide a defense and, potentially, indemnity if a "suit is brought against an "insured" for damages because of "bodily injury" caused by an "occurrence" to which this coverage applies."[24]

"Bodily injury" is defined in the policies as "bodily harm, sickness or disease…"[25]

An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in…'[b]odily injury'…"[26]

A plain reading of the Personal Liability coverage provision and the definition of "occurrence" evidences that an "accident" and a "bodily injury" cannot be one and the same under Liberty's policies. "Bodily injury" must be *caused by* an "occurrence," and an "occurrence" must *result in* "bodily injury." One cannot be permitted to swallow up the other lest the causative element be lost. There is no ambiguity in the term "occurrence" or "bodily injury," and no ambiguity in the way in which these terms relate to one another.

An "occurrence" is an "accident, including…repeated exposure to…harmful conditions…"[27] Thus repeated exposures may, in some instances, be "accidents." The FAC alleges that Michael was "repeatedly…exposed…to [Hugo's] hazardous cigarette smoke while he…lived at his childhood residence…"[28] Thus the FAC alleges that Michael suffered repeated exposure to a hazardous condition during his childhood years, long before Hugo had a homeowners' policy.

---

[24] **Coverage E – Personal Liability**, DN 1-1, PageID # 19.
[25] **Definitions, 1.** "Bodily injury," DN 1-1, PageID # 19.
[26] **Definitions, 5. "Occurrence,"** DN 1-1, PageID # 19.
[27] *Id.*
[28] FAC, DN 23-2, ¶ 8, PageID # 289.

Michael has brought suit against Hugo, the "insured,"[29] for damages for bodily injury the FAC alleging that Michael "has recently…been caused to develop chronic obstructive pulmonary disease, osteopenia (with chronic compression fractures of his L2 and T2 vertebrae, osteoarthritis in hips and knees, chronic back pain and/or degenerative disc disease, [and] cataracts…"[30] The FAC alleges that Michael developed the illnesses and conditions there listed "within one year from the commencement of this action…"[31]

However, the FAC does not allege all that an "occurrence" under the policies requires. It does not allege that the repeated exposure to secondhand smoke resulted in his "bodily injury." The FAC avoids such an explicit allegation which would allege an "occurrence" falling outside the policies' periods. The parties agree that these occurrence-based policies, "provide[] coverage for incidents that *occur* during the specified period regardless of when the claim is made." *State Farm Fire and Cas. Co. v. Estes*, 133 F.Supp.3d 893, 897 (W.D.Ky.2015)(quoting *C.A. Jones Mgmt. Grp., LLC v. Scottsdale Indem. Co.*, No. 5:13CV-00173, 2014 WL 811654, at *6 (W.D.Ky. Feb. 28, 2014)(citations omitted)) .[32] The parties also agree that the insurer's duty to defend is limited to suits "in which the language of the complaint would bring it within the policy regardless of the merit of the action." *Brown Found.*, 814 S.W.2d at 279.

The FAC, as written, does not allege an "occurrence" for which there might be coverage under the policies.

The FAC states:

As a direct, natural and foreseeable result of [Hugo's] *decisions* to repeatedly…expose…[Michael] to…hazardous cigarette smoke, and as a substantial factor and proximate cause of *such decisions,*…[Michael] has recently,

---

[29] In pertinent part, **Definitions, 3.** "Insured" means "you…" In this policy, "you" and "your" refer to the "named insured" shown on the Declarations…" Hugo Bobzien, Jr. is the "named insured."
[30] DN 23-2, ¶ 10, PageID # 290.
[31] *Id.*
[32] DN 23, p. 19, PageID # 267; DN 24-1, p. 8, PageID # 307.

and within one year from commencement of this action, *been caused to develop* [various illnesses].[33]

The FAC alleges that Michael's bodily injury resulted from Hugo's decisions, and that Hugo's decisions were the proximate cause of Michael's bodily injury. Decisions to act and actions are not synonymous. An "occurrence" under the policies is a happening or event which constitutes an "accident" resulting in "bodily injury." The "accident" and the "bodily injury" cannot be separated, as the causal element that one result in the other is an integral component of the definition. Decisions not acted upon are a nullity and thus allege no connection to "bodily injury." Had Hugo made the decision to smoke in the presence of his son, but not gotten around to buying cigarettes, for example, there would be no act by Hugo having any connection to the development of Michael's illnesses and conditions, and coverage under the policy would not be implicated at all. While negligent decisions can, from a legal standpoint, be found to have proximately caused or have been a substantial factor in bringing about an act or event that results in bodily injury, the fact that the FAC articulates a legal theory alleging tort liability for Hugo's decisions does not answer the question whether the FAC alleges a covered "occurrence." It is not the allegation of a theory of tort liability or the potential success or failure of such a claim which is relevant. To conclude there is potential coverage, there must be an allegation of an "occurrence" during the policy period alleged in the FAC. The facts alleged must articulate a happening or event constituting an "accident," something which can result in "bodily injury." We agree with Liberty that if the FAC is not read as marrying the exposure to the bodily injury, it lacks any connection to Hugo's decision to smoke, and thus does not meet the definition of "occurrence" under the policies.

---

[33] DN 23-2, ¶ 10, PageID #290 (emphasis added).

Liberty argues that a finding that the "occurrence" alleged in the FAC was the exposure to secondhand smoke when Michael was a child is supported by scientific evidence that immediate harm occurs from such exposure. Hugo's Estate contends that the scientific evidence on the effects of secondhand smoke is contested and thus a fact not within the province of this court to decide. We agree. However, resolution of this fact is unnecessary to a determination of the coverage issue.

Under no plain reading of the FAC does Michael allege an "occurrence" under the policies. While he alleges an act of exposure (Hugo's exposure of Michael to secondhand smoke during Michael's childhood) and "bodily injury" (illnesses and conditions which developed in 2016), the FAC does not allege that the one caused the other. Thus the requisite allegation of an "occurrence" is absent.

Even under a reading of the FAC that accepts as implicit that Hugo's alleged negligent decision to smoke in the presence of his children resulted in his smoking,[34] it is not the metaphysical decision to smoke *per se*, but rather the physical act of smoking to which the FAC alleges Michael was exposed. Even if negligence in deciding to smoke around the son is alleged to set the stage, so to speak, for his action in actually smoking, the repeated exposure to secondhand smoke during Michael's childhood is the *only* event alleged in the FAC, and thus the only event to result from Hugo's decisions from which the later-developed illnesses and conditions could possibly be alleged to flow.

Taken to its logical extreme, many decisions (the decisions to get married, have children, buy a house, or to address a tobacco addiction, to name a few) could all be said to have in some

---

[34] A step not difficult to take, but for the fact that the FAC does not explicity connect the decision to smoke to Hugo's smoking. While the Estate may argue that this is splitting hairs, it is insistent in its own argument that the court may not stray from the language of the FAC in determining whether the claims are possibly covered under the policy terms.

way influenced the course of the family's life events.  However, the personal liability coverage contained in Hugo's homeowners' policies is not insurance for Hugo's wise "life choices" except to the extent that any of those life choices are alleged to have proximately resulted in an "'accident' which resulted in 'bodily injury'" occurring during the policy period to someone who may recover under the policy.

The Estate notes that the FAC alleges that Michael suffered  "bodily injury" in 2016 and not before.  But the FAC must present some allegation by which Hugo's decision to smoke resulted in "bodily injury" to Michael, otherwise Hugo's personal liability coverage is not implicated. "The primary purpose of a homeowner's policy is to provide package coverage for the insured in the insured's capacity as a homeowner. [citation omitted].  The general liability provisions of a homeowner's policy provide insurance against liability arising from the condition of the insured premises, and liability stemming from the insured's tortious personal conduct which may occur at any place on or off the insured premises.  [citation omitted]." 46 C.J.S. Insurance § 1354, XVI. Risks or Causes of Loss, G. Homeowner's Insurance, 1. In General (2019).  The FAC embodies no such theory, even taking the allegations to the limit of reasonable interpretation.

Hugo's Estate argues, under a series of cases, that there was no "occurrence" until 2016 because there was no "accident" until Michael developed various illnesses and conditions in that year, and his tort claim for "bodily injury" then became ripe. Under basic tort principles, an injury must occur before a cause of action in tort accrues; that is, a compensable bodily injury must exist for which the injured party may seek compensation. However, as noted in *Forty-Eight Insulations*, "There is a clear distinction between when bodily injury occurs and when the bodily injury which has occurred becomes compensable." 633 Fed.2d at 1223.

The Estate urges that the development of various illnesses and conditions alleged in the FAC constitutes the "accident" which resulted in illnesses and conditions constituting Michael's "bodily injury." Thus, it contends that the FAC alleges a covered "occurrence." For the following reasons, we conclude that the Estate's argument under the cases cited cannot be squared with the facts alleged in the FAC.

While the court is limited to the facts alleged in the FAC, it is not required to accept conclusions drawn from those facts in the parties' summary judgment arguments. Additionally, the court cannot add to or alter the facts alleged in the FAC. A reasonable reading of the FAC as a whole does not reveal an allegation on an "occurrence" which potentially, possibly or might come within the terms of the policy.

The Estate relies on *Monticello Ins. Co. v. Ky. River Comm. Care, Inc.*, 173 F.3d 855 (6th Cir. 1999)(table) for the proposition that the "time of the occurrence of an accident" is when the complaining party was actually damaged and not at the time the wrongful act was committed.

In *Monticello*, Kentucky River, a provider of resident care for mentally disabled persons, placed a disabled man into an in-home setting and, knowing that he had been accused of sexual assault at a prior time, failed to inform the home of this fact. Kentucky River had insurance coverage at the time of placement that potentially provided coverage for claims arising from negligent placements. The policy in force three years later when the disabled individual allegedly sexually assaulted a young boy in the home, contained exclusions precluding coverage for Kentucky River's placement of the individual.

Kentucky River sought coverage under the policy in force at the time of the placement, rather than at the time of the assault. A federal court applying Kentucky law held, however, that the sexual assault constituted the "occurrence" resulting in the injury for which damages were

sought, explaining that the determination of the time of the occurrence of an accident is akin to the determination of the ripeness of a tort claim, noting that "Tort liability is contingent upon damages from a destructive occurrence." *Monticello Ins.*, 173 F.3d at *4.

The Estate cites to *Asbury College v. Ohio Cas. Ins. Co.*, No.2004-CA-001044-MR, 2005 WL 1252331 (Ky.App. May 27, 2005), an unpublished decision from the Court of Appeals of Kentucky, which involved the alleged negligent hiring of a college student to a position at the college. The employee allegedly sexually abused, assaulted, battered, and falsely imprisoned a 13-year-old boy. Twenty-four years after the alleged abuse, the victim sued the college, members of the college disciplinary committee, and the alleged perpetrator. In prior years, the college had CGL coverage, but, at the time of the alleged sexual assault, the coverage had lapsed. The court held that to determine when an accident triggering insurance coverage occurs, the "occurrence trigger" is the time the claimant is injured. *Asbury Coll.*, *Id.* at *2. As the sexual assault occurred after the CGL policy had lapsed, there was no coverage for claims against Asbury College or its affiliates for the negligent hiring.

Finally, the Estate cites to *Stillwell v. Brock Bros. Inc.*, 736 F.Supp. 201 (S.D.Ind. 1990) in which an Indiana federal district court applied Kentucky law and held that the term "accident" was not ambiguous and "refers to the fruits of a negligent act, not to the sowing of the seeds. It is the consequence, not cause, that constitutes an accident." *Id.* at 206.

The Stillwells had hired Brock Brothers to re-roof their home. Brock Brothers performed the work improperly, apparently blocking a furnace gas vent or vents. Five months after the completion of the work, the Stillwells turned their furnace on and were injured when furnace gases were emitted into the house. Brock Bros. had CGL coverage at the time of the work, but the policy lapsed before the Stillwells were injured by furnace gas emissions. The Brock

Brothers sought coverage under the lapsed policy, urging that the policy had been in force at the time of the roofing work and therefore should provide coverage for the claims against them.

The court found that there was no coverage because there was no policy in force at the time the Stillwells were injured. The court reasoned:

> …[T]he time an accident "occurs" is the time when the complaining party is actually injured…The plaintiffs admit that they sustained no damages until October of 1987 when they turned on their furnace…Because the Transamerica policy only covers "occurrences" that occur within the policy period, and the plaintiffs did not sustain an injury within that period, Transamerica is not obligated either to defend or indemnify against the plaintiffs' claims. *Id.* at 205.

With regard to *Stillwell* and its holding, the Estate suggests that "the same rationale [for determining when an accident occurs] holds true, but the effect for the insurer and insured is the opposite." DN 24-1, p. 11, PageID # 310. This attempt at turning the *Stillwell* case on its head, and its comparison to "negligent decision" cases does not work, and here is why.

In *Stillwell,* the re-roofing occurred when there was coverage for Brock Brothers' negligent roofing job, but no coverage for Brock Brothers at a later time when the furnace was turned on and resulted in injury caused by furnace gases. Thus the alleged negligent re-roofing by Brock Brothers would have potentially been covered, but for the fact that the roofing job did not injure the Stillwells directly and immediately. Rather, the act of re-roofing set the stage for the furnace gas accident which directly injured them. The claim against the Brock Brothers was for the roofing job which covered the furnace exhaust vents, making the accident and resulting injury possible, but there was no Brock Bros. policy in force at the time of the accident.

Similarly, in *Monticello* and *Asbury College*, the alleged negligent placement and negligent hiring, respectively, set the stage for a later sexual assault by the alleged perpetrator negligently placed or hired. The decision to place or hire which resulted in the hiring of alleged

sexual predators did not directly cause injury. The alleged sexual assaults enabled by the placement/hiring resulted in "bodily injury" to the victims. There was potential coverage for the placement and the hiring which was unavailable when the event causing the "bodily injury" occurred.

By contrast, there was never potential coverage for the exposure to secondhand smoke during Michael's childhood as there was no policy in force during that time. The FAC seeks to create a covered "occurrence" which falls under the later-purchased policies. In the *Monticello, Asbury College,* and *Stillwell* cases, the intent of the parties to provide coverage for the events in question was clear, but the causes of action did not accrue until after the policies lapsed. Here, there was no coverage at the time of exposure and the policy clearly precludes coverage under these homeowners' policies for "occurrences" outside the policy period. The cases cited by the Estate thus do not support the proposed "inverse theory" of their application in this case.

We thus come full circle to our prior reasoning that the FAC does not allege an "occurrence" within the policy period.

In *Monticello*, a negligent decision to place resulted in a placement which enabled the placed individual to commit the injury-producing sexual assault. In *Asbury College*, the decision to hire resulted in a hiring which enabled the employee to commit the injury-producing sexual assault.

In Michael's case, the FAC alleges a negligent decision to repeatedly expose Michael to secondhand smoke. The decision to expose resulted in the exposure during his childhood when Hugo had no personal liability coverage. The FAC alleges that Michael was "caused to develop" various illnesses and conditions in 2016 when there *was* personal liability coverage for "occurrences" during the policies' periods.

Hugo's Estate alleges that the covered "accident" identified in the FAC is Michael's development of illness and disease in 2016, and the illness and disease which thus developed is the "bodily injury" he suffered from the development, all occurring during the policy periods, and thus affording him potential coverage. The FAC alleges that Michael was "caused to develop" the listed illnesses and conditions. The Estate contends that the development constitutes an "accident" because it was unintended and unexpected from Hugo's standpoint.

The Estate's classification of the FAC's allegations of the "development of disease" and the "disease thus developed" as "accident" and "resulting bodily injury," respectively, is problematic under the cases relied upon by the Estate. In each of those cases, there was an act by the insured which enabled a subsequent, separately identifiable accident to occur which resulted in bodily injury for which the injured party sought to hold the insured liable.

In *Monticello*, the negligent placement of the perpetrator set the stage for the sexual assault which caused the bodily injury for which compensation was sought from the insured. Similarly, in *Asbury College,* the negligent hiring of the perpetrator set the stage for the sexual assault which injured the victim. In *Stillwell*, the negligent re-roofing enabled the furnace gas exposure incident to occur.

The FAC states that "As a direct, natural and foreseeable result of [Hugo's] decisions…to…expose…[Michael] to his hazardous cigarette smoke, and as a substantial factor and proximate cause of such decisions, [Michael] has recently, and within one year from commencement of this action, been caused to develop [various illnesses and conditions]…" and he alleges that [Hugo] did, repeatedly expose Michael to secondhand smoke. The FAC identifies the causative agent of the development of the illnesses, repeated exposure to secondhand smoke, which is akin to the sexual assaults in *Asbury College* and *Monticello*, and the trapped furnace

gases from the use of the furnace, which resulted in injuries in those cases. The problem is that the exposure to secondhand smoke occurred outside the policy period and cannot therefore constitute a covered "occurrence" in this case.

But the Estate urges the court to find that the "accident" was the development of the illnesses themselves. The language of the FAC cuts across the Estate's "accident" argument as it alleges that Michael was "caused to develop [various illnesses and conditions]" as "a direct, natural and foreseeable result of [Hugo's] decisions…" If the development of Michael's maladies was the direct, natural and foreseeable result of *anything*, how could the development be an "accident?"

Further, the Estate cannot manipulate the timing of the "occurrence" by employing the passive voice in the FAC in such a way that Michael's "bodily injury" is alleged to have resulted from unidentified causes, thus avoiding a verbal collision between the exposure and the later development of illnesses and conditions. The FAC must allege sufficient facts from which to find that a covered "occurrence" is alleged. The only "decision" made by Hugo for which the FAC seeks to hold him responsible is the decision to repeatedly expose Michael to secondhand smoke. The FAC indicates that the decision was acted upon by Hugo, as he is alleged to have, in fact, exposed Michael to secondhand smoke. This exposure occurred at a time prior to the policies' periods. The FAC alleges that Michael was "caused to develop" the listed maladies later in life without explicitly identifying what caused the development. This use of the passive voice in describing Michael being "acted upon" cannot alter the fact that nothing other than exposure to secondhand smoke is alleged by the FAC to have been the subject of a decision by Hugo related to Michael. Therefore, either (1) Hugo's decision to smoke in the presence of his children resulted in repeated exposure to secondhand smoke which played a substantial role in

Michael's later development of illnesses and conditions, but the exposure constitutes an "occurrence" outside the policies' periods or (2) the development of illnesses and conditions in 2016 was not causally connected to the repeated exposure to secondhand smoke which would then not implicate any responsibility flowing from Hugo's decision to smoke in the presence of his children and there could be no liability coverage therefore. In either event, a reasonable reading of the FAC as a whole does not reveal an allegation which potentially, possibly or might come within the coverage of the policies.

As noted in *Liberty Ins. Corp. v. Bowles*, 36 F.Supp.3d 756 (E.D.Mich. 2014), a case in which the court struggled in addressing whether there was a covered "occurrence" alleged in a state court complaint that outlined two separate theories as to what occurred, "Either something happened between Defendants at Bowles' home on September 7, 2010 or it did not. If nothing happened, there would be no "occurrence" to trigger coverage in the first place. But if something did happen, the only *facts* available to the Court are those set forth in…the First Amended Complaint." *Id.* at 759-760 (emphasis in original). Either something occurred between Hugo and his son which gives rise to potential coverage under Hugo's personal liability coverage or it did not. The Estate cannot have it both ways under the factual allegations of the FAC.

The fact that the insurer has a duty to defend "based on allegations in the complaint, even if the allegations are groundless, false or fraudulent," does not mean that any allegations will do because we are not to address whether the claims are potential meritorious. To read the insurer's duty in this way would require insurers to always provide a defense. Rather, the duty to defend only kicks in when the allegations of the complaint allege an "occurrence" for which there is potential coverage. We note that "[t]he obligation to defend arises out of the insurance contract,

not from the allegations of the complaint against the insured." *Thompson v. West Am.Ins.Co.*, 839 S.W.2d 579, 581 (Ky.App. 1992).

The *Estes* case cited *infra*, provides some support for our conclusion. In *Estes*, a young girl was sexually abused by her grandfather in her grandparents' home from 2001 to 2004. He pled guilty to criminal charges in 2010. Three years later, the victim, then an adult, filed an action against her grandfather for willful sexual abuse and against her grandmother for failure to properly supervise and/or to protect her from the abuse. The grandparents had no homeowners' insurance during the period of the abuse. They obtained a "Condominium Unitowners" policy from State Farm which became effective in 2007 and was renewed annually. State Farm sought a declaratory judgment that it need not indemnify or defend the grandparents in the underlying suit against them.

State Farm argued, among other grounds, that the harm to the victim occurred outside the policy period and thus there was no coverage, despite the victim's contention that she continued to suffer injury in the form of mental anguish through 2009 at the hands of her grandmother. The granddaughter, contending that she suffered bodily injury at the hands of her grandfather, claimed that her grandmother's invitations to the home where the abuse occurred from 2001 through the period of abuse and, thereafter, through 2009 caused her to suffer mental anguish associated with the physical abuse during and beyond the period of physical abuse. The court held, in part, that the emotional harms were connected to physical injuries which occurred years before the policy came into effect. Therefore, as the claim for bodily injury at the hand of her grandfather were outside the policy period, "there [wa]s no bridge that would bring the later-suffered emotional harm [at the hands of her grandmother] under the Policy's umbrella." *Estes*, 133 F.Supp.3d at 898.

### 2. Does the FAC allege an "accident" for which Hugo potentially has coverage?

Liberty contends that the exposure to secondhand smoke cannot constitute an "occurrence" under the policies because Hugo's smoking was an intentional act, not an accident.

The Supreme Court of Kentucky stated in *Martin/Elias Properties*[35] that the court is to apply the doctrine of fortuity "to determine whether something constitutes an 'accident' for issues of CGL coverage…" The court must determine "whether the insured intended the event to occur" and "whether the event was a 'chance event' beyond the control of the insured."[36]

The FAC alleges that Michael was "repeatedly, forcibly, knowingly, intentionally, wantonly chronically, recklessly, grossly negligently and/or negligently exposed and subjected to [Hugo's] hazardous cigarette smoke…"[37] While the FAC includes, on the one hand, negligent conduct, in each instance that it does so, there follows a paragraph that states: "The conduct of [Hugo] as herein alleged was committed intentionally, knowingly, wantonly, recklessly, and/or with gross negligence."[38] Clearly, the allegations of the FAC indicate that Hugo intended to smoke in the presence of his children. That his decision to do so has been labeled as negligent does not change the intentional nature of the act. "A volitional act does not become an accident simply because the insured's negligence prompted the act." *Ind. Gas Co., Inc. v. Aetna Cas. & Sur. Co.,* 951 F.Supp. 780, 784 (N.D.Ind. 1996), *vacated on other grounds,* 143 F.3d 314 (7th Cir. 1988)(citations omitted). We conclude that the FAC alleges intentional conduct by Hugo in exposing his son to secondhand smoke.

The Estate urges that Michael's development of various illnesses and conditions was an "accident" as he was randomly unlucky in becoming sick. However, Liberty urges that there is

---

[35] 544 S.W.3d at 642.
[36] 544 S.W.3d at 643.
[37] DN 23-2, ¶¶ 8, 22, 27, 32.
[38] DN 23-2, ¶¶ 11, 24, 29, 34.

no "chance event" alleged in the FAC because it states that "as a direct, natural, and foreseeable result of [Hugo's] decision to…expose and subject [Michael] to his hazardous cigarette smoke, and as a substantial factor and proximate cause of such decisions, [Michael] has recently…been caused to develop [various illnesses and conditions]."[39]

We reiterate our earlier conclusion that whatever the cause of Michael's maladies, the FAC clearly alleges that his "bodily injury" was directly, naturally and foreseeably caused, and not mere happenstance. As an "accident" under *Martin/Elias* must be both unintended by the insured and a chance event, the court concludes that the FAC does not allege a happening or event which constitutes an "accident," and thus there is no covered "occurrence" under the policies.

### 3. Should coverage be excluded for claims brought by a relative of the insured who resided in the insured's household at the time of the "occurrence?"

Liberty contends that there should be a declaration of no coverage for Michael's claims against Hugo because at the time Hugo exposed him to secondhand smoke Michael lived in his father's home and thus was, an "insured" within the meaning of the policy's definition.

Hugo's Estate argues that the household exclusion reads in the present tense. However, the exclusion states that **Coverage E – Personal Liability** does not apply to:…Bodily injury to you or an 'insured' within the meaning of part a…of 'insured' as defined."[40] "Insured" is defined as "you and residents of your household who are your relatives…"[41]

The parties both recognize that the purpose for such household exclusions is to prevent collusive claims. *See Tower Ins. Co. of N.Y. v. Horn*, 472 S.W.3d 172, 176-177 (Ky.

---

[39] DN 23-2, ¶ 10, PageID #290.
[40] **Section II – Exclusions, 2. Coverage E – Personal Liability,** f.
[41] **Definitions,** 3., a.

2015)(noting "the purpose of the household exclusion was to protect the insurer from 'over-friendly lawsuits' [citations omitted]").

Liberty argues, and we agree, that it is not a reasonable interpretation of "occurrence" to create coverage for later-developed injuries that would have been excluded from coverage at the time of the exposure.

We note many cases in which, for purposes of addressing the household exclusion, a determination was made whether the injured party was a resident of the insured's household at the time of the occurrence. *State Farm Fire & Cas. Co. v. Odom*, 799 F.2d 247 (6th Cir. 1986); *State Farm Fire & Cas. Co. v. Keegan*, 209 F.3d 767 (6th Cir. 2000); *Country Mutual Ins. Co. v. Cronin*, 17 F.Supp.3d 900 (E.D.Mo. 2014); *Met. Prop. & Cas. Ins. Co. v. McCarthy*, 43 F.Supp. 3d 1157 (W.D.Wash. 2014).

While this is a retrospective look to a time, decades ago, when Hugo had no homeowners' coverage, it makes no sense to look at residency at any other time than the time of the occurrence, as the purpose of a household exclusion is to preclude "over-friendly" claims for the particular "occurrence" in issue. We conclude that the household exclusion evidences an intent to exclude the type of relational claim raised here and therefore coverage should be precluded in this case.


**4. Does the physical abuse exclusion preclude coverage in this case?**

Finally, Liberty argues that the FAC alleges injuries resulting from physical abuse and thus Michael's claims are subject to the exclusion for "sexual molestation, corporal punishment or physical or mental abuse."

Liberty contends that the dictionary definitions of "abuse" include "physical maltreatment," which is alleged in the FAC as "repeatedly," "forcibly," and "chronically" exposing Michael to "hazardous cigarette smoke." The FAC alleges that Hugo breached various duties to properly care for and protect his son, alleging that "he expos[ed] and subject[ed] his minor son…to unsafe, dangerous, neglectful, abusive and/or harmful conditions[.]"

While a plain reading of the FAC reveals allegations of reprehensible conduct, as artfully described through the employment of numerous adjectives. However, the question is whether the term "physical abuse" under the policies is clear and unambiguous, and if not, whether more than one reasonable understanding of the term exists.

The court agrees with the Estate that the meaning of the term "physical abuse," undefined in the policy, is not clear and unambiguous and is susceptible to more than one reasonable ordinary meaning. The term may constitute, as suggested by Liberty, physical maltreatment in the generic sense, and thus might arguably include Hugo's repeated exposure of Michael to secondhand smoke. However, it is also reasonable to ascribe a more specific meaning with a criminal overtone, as the term is included in a string of actions ("sexual molestation, corporal punishment, or physical or mental abuse") the commission of which may, and often do, have criminal ramifications. The exposure of a child to secondhand smoke may or may not meet a more restrictive definition of the term, were it to be applied.

As the term "physical abuse" is undefined in the policies, and the common usage unclear, we find that coverage is not precluded by application of the exclusion.

### G. Summary

Summing up, the court concludes that the FAC does not allege a covered "occurrence," as Michael's exposure to secondhand smoke occurred outside the policy period and no event alleged in the FAC constitutes an "accident" resulting in "bodily injury" under the policies' terms. Hugo's conduct in exposing his son to secondhand smoke was an intentional act and the FAC alleges that Michael's "bodily injury" was a "direct, natural and foreseeable result" of Hugo's decisions to smoke, thus precluding a finding that the FAC alleges a "chance event."

In keeping with the purpose and intent of the homeowners' policies, the household exclusion should operate to preclude coverage for claims made by Michael against Hugo for exposure to secondhand smoke which occurred while Michael was a child residing in his father's home.

Finally, we conclude that despite the language in FAC, the "physical abuse" exclusion would not prevent coverage under the policy for an "occurrence," as the term "physical abuse" is undefined and more than one reasonable meaning exists, neither of which clearly indicate that secondhand smoke exposure would constitute "physical abuse" under the policy.

For these reasons, Liberty's motion for summary judgment will be granted and Hugo's Estate's motion for summary judgment will be denied. The court will enter a declaratory judgment that there is no possibility of coverage under the policies for claims made in the FAC and that Liberty has no duty to defend or indemnify Hugo's Estate in the underlying state court action.

**IT IS SO ORDERED.**

March 28, 2019

**Charles R. Simpson III, Senior Judge**
**United States District Court**